# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs December 3, 2013

## STATE OF TENNESSEE v. TERRY MCREE

**Appeal from the Criminal Court for Shelby County**
**No. 11-02788     Carolyn Wade Blackett, Judge**

---

**No. W2013-00194-CCA-R3-CD  -  Filed March 21, 2014**

---

A jury convicted the defendant of aggravated sexual battery, a Class B felony, and he was sentenced to twelve years' imprisonment. The defendant appeals, alleging that the trial court erred in: (1) denying his motion to suppress and admitting an incriminating statement he made to police; (2) refusing to allow him to introduce the contents of a learned treatise during the cross-examination of a witness; (3) limiting closing argument; (4) excluding character evidence; (5) denying his motions for judgment of acquittal and for a new trial on the basis of insufficient evidence; and (6) improperly applying the enhancing and mitigating factors during sentencing. After a thorough review of the record, we conclude that there was no error, and we affirm the judgment of the trial court.

**Tenn.R.App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JEFFREY S. BIVINS, JJ., joined.

J. Jeffrey Lee, Memphis, Tennessee, for the appellant, Terry McRee.

Robert E. Cooper, Jr., Attorney General & Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jennifer Nichols and Carrie Shelton, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

The defendant was convicted of committing aggravated sexual battery against his

seven-year-old step-granddaughter, who had spent several days at the defendant's home visiting her aunt, cousin, and other family members. When the victim returned to her parents, she told them that the defendant had digitally penetrated her. The defendant gave a statement to police in which he described the victim as "fast" and admitted that he may have touched her, and he was subsequently indicted for rape of a child.

At trial, the victim's mother testified that she had five children, including her middle child, the victim, who was nine years old at the time of trial. The victim's mother testified that the defendant was her husband's step-father and that all her children called him granddaddy. The victim's mother and her husband both worked full-time, and her children were in daycare after school and for part of the summer vacation. When they were not at daycare, they would either be at home under the care of the eldest child or at their paternal grandmother's house. The children would stay at the house overnight for a period up to a week and a half. At the time, the victim's aunt, who was tending her newborn, the victim's uncle, their four children, and the defendant were staying at the house; the victim's grandmother was on an extended visit out-of-state.

The victim's mother testified that the victim was in special education classes at the time of trial but that she attended regular classes at the time of the assault. She testified that the victim did not act inappropriately or engage in dirty dancing either then or as a seven-year-old.

On July 21, 2010, the victim's mother dropped her off for an extended stay at her grandparents' house, where the victim enjoyed playing with a cousin who was one year older than she was. None of the victim's siblings went on this visit. On Friday, July 23, 2010, the victim called her mother at work and asked her mother to come get her because she was ready to go. The victim's mother could not leave work, and the victim called her again the next morning to ask again to be taken home. The victim then called later in the day to say that "it was okay," and she didn't need to be taken home. The victim's mother spoke to her periodically over the next few days. Finally, the victim called and "kept on saying she was ready to go home and she was scared." The victim's mother picked up the victim, who was unusually silent in the car.

At home, the victim told her family that she had something to tell them, but then expressed fear that she would be in trouble. After four tries, the victim said, "granddaddy did nasty stuff to me." The victim's mother's initial reaction was to feel "it couldn't have been true" because "that's not who he is." The victim explained that her grandfather "got on top of her and took all her clothes off and stuck his finger in her and he tried to st[i]ck his middle part in her." The victim said that she got up and tried to run to the bathroom, but the defendant ran after her and told her to go back so she wouldn't wake up her aunt. He made

-2-

her go back in the room and lie down, and then he put her finger in his mouth.

The victim's parents called the victim's grandmother, and the victim told her grandmother what had happened; the victim's grandmother told them to call the police. The victim's parents, however, took the whole family, including the victim, who was scared and crying, to the defendant's house; the victim's mother said they did not stop to call the police because the victim's father wanted to "get" the defendant. The defendant was missing when they got there, and the victim's aunt called the police.

A few days later, the victim's parents took her for a medical examination. After the crime, the victim began wetting the bed and having nightmares, and she could no longer sleep with the lights off. The victim's mother testified that the victim's story had not changed in the two years since the assault and that the victim had never made any allegations regarding any other man molesting her.

On cross-examination, the victim's mother testified that she had previously been comfortable with her daughter staying at the defendant's house. She acknowledged being aware that there were seven people staying at the house and that two of the three bedrooms were not used for sleep, as one had water damage and another was filled with exercise equipment. The victim's mother testified that she had had no feud with the defendant prior to the incident and that despite her initial reaction, she and her husband both believed her daughter to be telling the truth.

The victim testified that on the night of the crime, she was in bed between her cousin and her step-grandfather. The victim had fallen asleep and was awoken when the defendant licked his finger and put it in the victim's "private part." The victim testified that both she and the defendant were clothed when she fell asleep,[1] but when she woke up her clothes were on the floor, and the defendant was undressed. The defendant was on top of the victim. The defendant then tried to put his "private part" in the victim. The victim's cousin remained asleep, and the victim got up to go to the bathroom because she was in pain. The defendant told her to get back into bed, but she went to the bathroom. When she got out, he was waiting for her in the hallway. She lay down on the floor in the hall. The next day, the defendant took the victim and her cousin to the park. The victim did not feel like playing, and she told her cousin that the defendant did "nasty stuff" to her. She told her mother the same thing. She testified that she told the truth in the video taken at the Child Advocacy Center.

On cross-examination, the victim testified at first that she did not remember what she

_____

[1]The victim also testified she wasn't wearing clothes and she took them off.

said to the interviewer at the Child Advocacy Center, then agreed that she had been asked whether the defendant's body touched hers three or four times and that she had once said no. She also recalled telling the woman that nothing went inside her vagina. The victim testified that she had lied to the interviewer because she was "scared to tell her" and agreed that she had gotten confused but that the prosecution had helped her remember what happened.

The prosecution then played the recorded interview as a prior consistent statement. In the interview, the victim was generally consistent with her testimony at trial. However, she also at various times told the forensic interviewer that no one had ever touched her private areas, that the defendant had not touched her with anything other than his hand, and that the defendant's penis had not touched her body. She also told the interviewer that nothing had gone inside her "middle part."

On redirect examination, the victim testified that she was not being truthful when she said that no one had touched her and that her grandfather had not touched her. She testified that she understood the difference between inside and outside and that her grandfather's finger went inside her body.

The victim's ten-year-old cousin testified that she, her parents, her three siblings, and her grandparents lived in one house in 2010. At the time of the assault, the victim was spending the night, and they were sharing a bed with their grandfather because, although they usually did not share a bed with him, there was not enough room in the living room for them. The victim's cousin did not remember anything happening that night. The next day, their grandfather took them to the park. The victim told her cousin, "I'm going to tell my mom that your granddaddy did something to me." The victim's cousin clarified that the victim had stated that their grandfather did "something nasty." The victim's cousin did not understand what she meant. When the police came to the house later, the defendant had left, although he normally stayed there and his clothes were still there. The victim's cousin testified that the defendant only took her to the park once. When the victim told her that their grandfather had done something to her, the victim's cousin did not believe her.

Officer Victoria Edwards of the Memphis Police Department testified that she responded to the 911 call from the defendant's house on July 28, 2010. She interviewed the victim, who told her that the defendant had penetrated her with his penis and with his fingers, and that he had put his fingers into his mouth first. The victim was very quiet and shy, and the interview lasted five minutes.

Mary Daley, a pediatric nurse practitioner, testified that she interviewed and examined the victim. The victim told her that her grandfather had touched her "middle part" with his finger and that it had hurt. She told Ms. Daley that her grandfather apologized the next day,

and when she indicated she was going to tell her parents, he told her not to tell because they would put him in jail if she did. Ms. Daley testified that the victim reported that the assault took place on July 24, 2010, and that she examined the victim on August 2, 2010. She testified that her physical examination neither confirmed nor excluded the possibility of a sexual assault. She testified that the victim would most likely not have had any residual injury from the events she described. Ms. Daley testified that an injury in a child's vaginal area would heal very quickly and leave no evidence. DNA evidence would no longer be present after 72 hours, and an injury may have healed after the passage of 72 hours. She testified that the victim reported burning urination, which could be predictive of genital manipulation, abrasion, or irritation. On cross-examination, Ms. Daley testified that she did not assess credibility in her report, but would report what the patient had told her.

Sergeant Thomas Griffin of the Memphis Police Department testified that he observed the forensic interview of the victim and tried to contact the defendant as a result. He called the defendant several times, leaving his name and contact information. Sergeant Griffin located an alternate address for the defendant through a driver's license search, and when he went to the address, the defendant answered the door. Sergeant Griffin asked the defendant if he knew who he was, and the defendant identified him as Sergeant Griffin, despite the fact that they had not previously met. Sergeant Griffin told the defendant that he needed to come to the police station to give a statement, and the defendant came the next day.

The defendant was given *Miranda* warnings and asked to read aloud a waiver of his rights to be sure he understood them. An audio recording of the interview was played at trial.

In the recording, the defendant told officers that he knew he was there because the victim had said he had sexually assaulted her. He told officers that his wife had called him on Wednesday and asked him what he had done because the victim had said that he "did the nasty to her." The defendant stated that he had denied the allegation. He told police that the victim had been staying at his home for two weeks. He did not remember anything about the night of the assault. He told police that the victim and her cousin usually slept with him because they wanted to avoid sleeping on the floor. He said that he did not remember warning the victim that if she told anyone, he would be locked up. He alleged that the victim had previously said she had been the victim of a sexual assault because "she will tell a story real quick to keep from getting a whoopin." When confronted with the fact that the victim had not in fact been in trouble at the time that she told her parents, he told police she had made up the story because she was "spoiled" and "fast." He clarified that he meant that she would dance provocatively and "drop it like it's hot."

After the defendant had stated a few times that he did not remember anything happening, police began to suggest he might have accidentally rolled onto the victim:

Now, if you're in the bed in your pajamas, and you're asleep and you happen to roll over on that child, that's one thing. That's an accident. You know, that happens. We all sleep kind of rough. If you actually did something to this child, actual penetration – cause there's a big difference now. It's a big difference between penetration and touching the child. The difference could be anywhere from ten to fifteen years . . . . Cause once we leave this room and you give this little "I don't remember nothing" statement, we're going to take it to the AG and they're going to – I'm just telling you, it ain't going to be pretty.

The defendant then told police he thought he had rolled on top of the victim accidentally. The defendant stated that he was habitually drunk. Sergeant Ray then told the defendant that they could tell the attorney general that he had been drinking. Sergeant Ray then suggested that the defendant had mistaken the victim for his wife:

You was inebriated. You don't know what you had done. You could've did anything. You could've been thinking, you know, "Is that my baby next to me?" You know what I'm saying? My woman. Anything could happen . . . . Because once we leave this room and we present this case to the AG, they're going to make the determination. Now that's the difference between – and I'm not trying to scare you – I'm just telling you – I'm just being honest – that's the difference between twenty-five and ten years. Or five years. That's a big difference.

Police told the defendant that they did not want to "put things in [his] mouth," and asked him again what happened. The defendant then stated he may have rolled over on the victim and may have touched her. Sergeant Ray then told the defendant:

. . . I'm telling you, they're gonna drop the hammer on you. If something went down, you need to tell us exactly what happened so we can know what to tell the AG, and that way we can keep you – you're fifty-four years old. You don't need to be in jail no ten or fifteen years. You feel me? If it's something that went down, you need to tell us what happened, and then we can tell the AG, "Man, he was a little reluctant at first, but he came forth and he was being honest with us, and he told us just what happened. What can we do for him?" . . . . Man, tell us what happened so we can go in and talk to these folks, so we

can get you some help. . . .

The defendant responded, "I think I can put it together . . . . I was, uh, in the bed asleep, intoxicated. And rolled over on grandbaby, I was thinking that she was my wife, and I touched her." The defendant stated he had touched the victim on the leg or thigh. He then admitted that when the victim threatened to tell, he told her he would go to jail because they would think he had raped her.

Sergeant Ray again mentioned the possibility of fifteen or twenty years in jail. Then, Sergeant Griffin asked the defendant whether there was a possibility that he touched the victim's vagina, to which the defendant responded, "Possibility, yes." He stated he did not remember and was not sure if he had attempted to have intercourse with the victim, but denied penetrating her with his finger.

Sergeant Griffin testified that he had made suggestions giving the defendant "outs" for his behavior during the interview based on a premise he learned at the John Reid interrogation school that it is best to keep the suspect talking.

On cross-examination, the defense began to ask Sergeant Griffin a question regarding the dangers of introducing fictitious evidence. The prosecution objected based on hearsay and based on relevance, as the court had already concluded the defendant's statement was not subject to suppression. The defense maintained that the statement of John Reid which it sought to introduce was from a learned treatise, but the trial court did not permit the treatise to be read. Sergeant Griffin acknowledged that he was the one that used the word "provocative" to clarify the defendant's use of the word "fast." He testified that the victim's grandmother was around five feet, ten or eleven inches tall. He also testified that, while he was observing the forensic interview with the victim, he formulated questions which he gave to the interviewer to ask the victim, which the interviewer asked "[i]n her own way."

The defendant then testified on his own behalf. At the beginning of the defendant's testimony, defense counsel asked the defendant if he had had the opportunity to spend time with adolescents in his family, and the State objected to the introduction of the evidence. The defense responded that it intended to introduce character evidence that the defendant was trustworthy under Tennessee Rule of Evidence 404. The trial court ruled that the defendant could introduce evidence that he was trustworthy in his family, but could not testifiy regarding other family members he had not molested. The defendant then testified that he had raised "[q]uite a few" children in his family, including nieces and nephews, and testified to his participation in family activities.

The defendant had maintained steady employment for most of his life, and while he

was initially a good employee, his drinking problem eventually began to affect his work performance, and he was fired. He testified that he was an alcoholic with financial problems. The defendant testified that he had slept in the one usable bedroom with the victim and another step-grandchild on the night in question, and that the victim's aunt and uncle and their other three children were asleep in the living room. He acknowledged that he had told Sergeant Griffin that he could have touched the victim's leg or thigh, but testified at trial that he did not think he could have confused her for his wife. He said that he had told police it was possible because they suggested it was a possibility. He testified that the "truest answer" he gave was that he had been drinking and did not remember. He explained that he did not adamantly deny the allegations because "[w]hen somebody ask me something that I don't know about, I ain't going to throw no temper tantrum or nothing like that. It was a mixup. I think it all could have been worked out." He testified that he did not put any part of his body into the victim's vagina and did not rub any part of his body on hers. He stated he was not attracted to adolescents and explained his flight from his home by stating he went to help his brother, who had another obligation, take care of their mother and that he did not know that anyone was looking for him.

On cross-examination, he testified that the victim did not have any feud with him prior to telling her parents he had raped her. He acknowledged that he had been sober enough to put on his matching pajamas. He testified that he might have thought the victim was his wife and rolled on top of her, but admitted that his wife was much larger than the victim and stated that he did not say he made a mistake and thought the victim was his wife. He acknowledged that he had described the seven-year-old victim as "fast" but testified he meant she danced fast.

He agreed that he took the children to the park on the day after the assault and that he gave the victim two dollars. He testified that he had left the house before the victim was picked up by her parents but acknowledged that his wife had then called him a couple of hours later to tell him that the victim had accused him of something. The defendant denied that he knew the police were looking for him, that he got any of Sergeant Griffin's messages, or that he was able to name Sergeant Griffin when Sergeant Griffin came to his mother's house. He then testified that he discovered Sergeant Griffin was looking for him and was trying to find out where Sergeant Griffin was when Sergeant Griffin came to his house. He agreed that the victim had told him she would tell her mother what he had done but did not remember telling her he would go to jail. He acknowledged having said it was possible he touched the victim's vagina, but he testified that he did not do it.

During closing argument, defense counsel highlighted the fact that the victim had made inconsistent statements to the forensic interviewer. Then he argued that the interviewer's questions were designed to elicit responses incriminating the defendant. He

summarized the interview during closing argument: "Okay. You're getting a little tired. Stand up for me. That's not the answer I was looking for. Pay attention. Put that doll down . . . . You see, what happened. Ms. Pat, she got greedy. She asked the same questions too many times." The prosecution objected to the argument related to the interviewer, noting that the interview had been admitted not as substantive evidence but only as prior consistent and inconsistent statements. The trial court ruled that the defense could make arguments from the interview "[a]s long as you're talking about the victim," but could not focus on the interviewer's statements. The court told defense counsel, "If you want to talk about inconsistencies, okay." Defense counsel then asked if he could read from the transcript. The trial court responded that the jury did not have the transcript and that the transcript would not be in evidence. The judge told defense counsel, "You can say that [they] should be able to recall that . . . . (Indiscernible) so for you to go through that page by page like that is not going to help." Defense counsel then explored the inconsistent statements given by the victim at the forensic interview.

The jury convicted the defendant of the lesser-included offense of aggravated sexual battery. The prosecution asked for an enhanced sentence based on the defendant's abuse of a private trust. The defense asked the court to consider two mitigating factors: (1) that the victim did not suffer serious bodily injury, and (2) that the defendant had maintained steady employment, had provided financially for his wife's family, and suffered from alcoholism. The trial court enhanced the defendant's sentence on the basis that he abused a position of private trust in committing the crime. It declined to find any mitigating factors.

## ANALYSIS

### I. Motion to Suppress

The defendant contends that the trial court erred in denying his motion to suppress and in admitting into evidence the recording of his interview with police. The State counters that the defendant's failure to include a transcript of the hearing on the motion to suppress constitutes waiver of this issue or, in the alternative, that the trial court properly denied the motion. The trial court found that the confession was knowing and voluntary. It determined that the defendant, who was questioned for less than one hour by two officers, did not exhibit signs of diminished capacity, and was capable of understanding his rights and waiver of his rights. The trial court further found that the officers did not make any misrepresentations and did not make promises of leniency.

The transcript of the hearing on the motion to suppress is absent from the record. It is the duty of the appellant to prepare a record sufficient to allow meaningful review. Tenn. R. App. P. 24(b) (mandating that "the appellant shall have prepared a transcript of such part

of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal"); *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). Accordingly, the absence of the transcript of a hearing generally constitutes waiver of the issue. *Thompson v. State*, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997); *Ballard*, 855 S.W.2d at 560-61 ("Where the record is incomplete and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which the party relies, an appellate court is precluded from considering the issue."). Without an adequate basis for review, this court presumes that the ruling of the trial court is correct. *Thompson*, 958 S.W.2d at 172.

However, where the record provides a basis for review, this court has proceeded to address the denial of a motion to suppress. *See State v. Grasty*, No. E2012-00141-CCA-R3-CD, 2013 WL 1458660, at *5-7 (Tenn. Crim. App. Apr. 10, 2013) (holding the issue was waived but nevertheless concluding based on the trial court's order and on evidence at trial that the trial court did not err in denying the motion); *State v. Garcia*, No. M2010-01661-CCA-R3-CD, 2012 WL 850698, at *20 (Tenn. Crim. App. Mar. 13, 2012) ("While our review of this issue is more difficult without the transcript of the hearing, we conclude we can review this issue on its merits, basing our review on the evidence presented at trial."); *State v. Taylor*, No. M2005-00313-CCA-R3-CD, 2006 WL 2206064, at *2-3 (Tenn. Crim. App. July 31, 2006) (concluding issue was waived but nevertheless reviewing based on trial court's detailed factual findings and recorded interview of defendant); *but see State v. Winters*, No. M2009-01164-CCA-R3-CD, 2011 WL 1085101, at *2 (Tenn. Crim. App. Mar. 24, 2011) ("concluding that "[a]lthough we are instructed to consider any evidence adduced at trial when reviewing the trial court's ruling on a motion to suppress . . . the consideration of such evidence should be done as a complement to the evidence from the suppression hearing and not as a replacement for such evidence" (citation omitted)). Here, although the transcript was not filed and the issue is considered waived, the record nevertheless demonstrates a basis for concluding that the trial court did not err in denying the motion.

A trial court's determination at a hearing on a motion to suppress that a statement to police was knowing and voluntary is binding on appeal unless the evidence preponderates otherwise. *State v. Carter*, 988 S.W.2d 145, 149 (Tenn. 1999). The party prevailing on a motion to suppress is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of law to the facts is reviewed de novo. *State v. Talley*, 307 S.W.3d 723, 728-29 (Tenn. 2010). Testimony presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fifth Amendment to the United States Constitution and article I, section 9 of the

Tennessee Constitution protect against compelled confessions. In order to find that a confession is not voluntary, the court must find there was coercive state action. *State v. Downey*, 259 S.W.3d 723, 733 (Tenn. 2008). The test of voluntariness is broader under the state than under the federal constitution, and a confession "must not be the product of 'any sort of threats or violence, . . . any direct or implied promises, however slight, nor by the exertion of any improper influence.'" *Downey*, 259 S.W.3d at 733-34 (quoting *State v. Smith*, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000)). Promises of leniency, however do not necessarily render a confession involuntary; instead, the critical question is whether law enforcement's actions were of a nature to overbear the defendant's will to resist. *State v. Smith*, 933 S.W.2d 450, 456 (Tenn. 1996). The court must determine "whether the accused was so gripped by the hope of leniency that he did not or could not freely and rationally choose among the available courses of action." *State v. Kelly*, 603 S.W.2d 726, 727 (Tenn. 1980) (quoting *Hunter v. Swenson*, 372 F. Supp. 287 (W.D. Mo. 1974)). Factors in determining voluntariness include the age of the accused; his level of intelligence and education; his prior experience with law enforcement; repeated and prolonged nature of the questioning; the length of the detention prior to obtaining the statement; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated, drugged, or in ill health; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013).

The defendant contends that this case is governed by *State v. Phillips*, 30 S.W.3d 372 (Tenn. Crim. App. 2000). In *Phillips*, this court concluded that a defendant's confession was involuntary where the interview leading to it revealed: (1) misrepresentations that investigators had DNA evidence; (2) "numerous steadfast denials" by the defendant; (3) threats of prosecution in the absence of a confession; and (4) promises of treatment for the defendant and his stepdaughter only if he fully confessed. *Id.* at 377. This case is distinguishable from *Phillips*. As the trial court found, the defendant here did not repeatedly assert his innocence but only maintained that he did not remember what happened. Neither did police promise him that he would receive treatment and avoid prosecution if he confessed. Law enforcement did not misrepresent the evidence that they did have against the defendant.

The officers did comment on the defendant's exposure during the course of the interview. Police first told the defendant that there was a big difference between touching and penetrating a child, "anywhere from ten to fifteen years." This statement, best understood as a general comment that aggravated rape, a Class A felony, carries a heavier penalty than aggravated sexual battery, a Class B felony, is the type of truthful representation that does not render a statement involuntary. *Smith*, 933 S.W.2d at 456 (observing that

-11-

"[t]ruthful statements about [a defendant's] predicament are not the type of 'coercion' that threatens to render a statement involuntary" (quoting *United States v. Pelton*, 835 F.2d 1067, 1073 (4th Cir. 1987))).

Police later suggested to the defendant that he had mistaken the victim for his wife, and told him, "Because once we leave this room and we present this case to the AG, they're going to make the determination. Now that's the difference between – and I'm not trying to scare you . . . I'm just being honest – that's the difference between twenty-five and ten years. Or five years." Finally, Sergeant Ray told the defendant that the attorney general would "drop the hammer" on him, but that if he told his story, police could talk to the attorney general "[a]nd that way we can keep you...you're 54 years old. You don't need to be in jail no 10 or 15 years." Sergeant Ray also urged the defendant to come clean "so we can get you some help."

In *State v. Smith*, the defendant was informed that if he told the truth, he would probably get counseling and more than likely would not be prosecuted, whereas he would definitely be prosecuted if he did not confess. *Smith*, 933 S.W.2d at 452, 455-56. The Tennessee Supreme Court concluded that these statements were equivocal and could not be understood as a promise that the defendant would go free. *Id.* at 456.

While the last two exchanges in the case at bar certainly hint that a confession could lead to leniency, less jail time, and possibly mental health treatment, there is simply no concrete "promise" made. Officers were forthcoming in telling the defendant that the attorney general would determine the charges. Immediately after referencing the defendant's exposure to incarceration, Sergeant Ray told the defendant they would tell the attorney general that he had been reluctant at first but ultimately honest and that they would ask the attorney general, "What can we do for him?" We cannot say that officers' statements were such that the defendant's will was overborne. *See State v. Brown*, No. M2007-00427-CCA-R3-CD, 2009 WL 1038275, at *22 (Tenn. Crim. App. Apr. 20, 2009) (holding that confession was not involuntary where the defendant was interviewed for forty-five minutes by two officers who promised to tell the district attorney that the defendant had cooperated if she were truthful); *State v. Spencer*, No. W2010-02455-CCA-R3-CD, 2011 WL 6147012, at *11 (Tenn. Crim. App. Dec. 8, 2011) (concluding that confession was voluntary despite detective's statement that he would tell the district attorney that the defendant had cooperated and would try to get the charges reduced). The fifty-four-year-old defendant, who came to the police station on his own and did not appear intoxicated, was advised of his rights, waived them, and was questioned for less than an hour by two officers. The trial court found that the defendant did not exhibit diminished mental capacity. The police made only equivocal statements regarding the possibility of leniency given in exchange for a confession. Accordingly, we conclude this issue is without merit.

## II. Admission of Learned Treatise

The defendant next assigns error in the trial court's refusal to let him read a portion of a treatise written by John Reid, an expert in interrogation whose techniques were referenced by Sergeant Griffin. The prosecution objected based on hearsay and on relevance, as the trial court had already ruled that the confession was voluntary. Defense counsel told the court that the portion of the treatise he intended to read would not concern the voluntariness of the defendant's statements to police but would address the dangers of introducing fictitious evidence during interrogation, essentially maintaining that the defendant merely acquiesced in statements suggested by Sergeant Griffin.

Hearsay, defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," is generally inadmissible as evidence. Tenn. R. Evid. 801(c), 802. The defendant here wanted to offer, for the truth of the matter asserted, a statement of John Reid that introducing fictitious evidence during an interrogation might be unduly suggestive. The statement is inadmissible as hearsay unless it falls within a hearsay exception.

The defendant maintains that the statement is admissible as an exception to the rule against hearsay under Tennessee Rule of Evidence 803(18). However, there is no content to subsection 18 of Tennessee Rule of Evidence 803, and the Advisory Commission's Comment to the "Reserved" subsection notes that "[l]earned treatises can be used to impeach an expert but are not themselves admissible to prove the truth of their contents. No good reason exists to permit hearsay to be taken as true just because it is written in books." Even under the Federal Rules of Evidence, a learned treatise may become substantive evidence only if the publication is relied upon or called to the notice of the expert and if any expert or judicial notice establishes it as reliable. Fed. R. Evid. 803(18)(A)-(B). While the Tennessee Rules of Evidence do allow treatises to be introduced for the purpose of impeachment, the rule is only applicable to expert witnesses. Tenn. R. Evid. 618; *State v. Blair*, No. M2009-01987-CCA-R3-CD, 2011 WL 743396, at *8 (Tenn. Crim. App. Mar. 3, 2011) ("A learned treatise may not be used to impeach a lay witness, since Rule 618 extends only to impeachment of expert witnesses."). Sergeant Griffin was not testifying as an expert in the field of interrogation but was merely testifying about his interrogation of the defendant. Accordingly, the treatise was not admissible and the trial court did not err in excluding it.

## III. Closing Argument

The defendant also objects to the trial court's limitations on defense counsel's closing

argument.[2]  Closing arguments, which have "special importance in the adversarial process," are intended to sharpen and clarify issues by allowing the attorneys to present their theory of the case and highlight strengths and weaknesses in the evidence. *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008).  Closing argument is a valuable privilege which should not be unduly restricted. *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001); *Russell v. State*, 532 S.W.2d 268, 271 (Tenn. 1976).  However, "[a]rgument must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Middlebrooks*, 995 S.W.2d 550, 557 (Tenn. 1999).  The trial court is entrusted with wide discretion in controlling the course of closing arguments and its decision will only be reversed upon an abuse of discretion.  *Bane*, 57 S.W.3d at 425.  Generally, "[a] trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010).

The defendant objects to the trial court's denying him the opportunity to highlight the interviewer's questions and technique in closing argument.  We conclude that the trial court did not abuse its discretion in ruling that the defendant could not focus on the interviewer's questions and motivations in closing argument.  The forensic interview was admitted solely to allow the jury to evaluate the consistent and inconsistent statements made by the victim.  The interviewer's questions were admitted only to give context to the victim's replies.  Because the jury was permitted to consider only the victim's replies as prior consistent or inconsistent statements, the argument regarding the interviewer's motivations was not predicated on evidence introduced during trial, and the trial court properly limited closing argument to exclude it.

---

[2]The defendant argues in part that his right to confront witnesses under *Crawford v. Washington*, 541 U.S. 36 (2004) has in some fashion been violated.  The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him," and article I, section 9 of the Tennessee Constitution preserves the right to "to meet the witnesses face to face."  Of course, confrontation relates to cross-examination of a witness. *Crawford*, 541 U.S. at 57.  A limitation on closing argument does not implicate the right to confrontation.

Insofar as the defendant asserts that he had the right to confront the forensic interviewer, his claim must fail both because the interviewer's statements were not actually admitted as substantive evidence and because the interviewer's statements were clearly not testimonial.  The interviewer said nothing which might have been admitted for the truth of the matter asserted, but merely asked the victim to recount the abuse.  The defendant did not call the interviewer as a witness, and there was simply no evidence traceable to the interviewer for the defendant to "confront."  The defendant, of course, exercised his right to confront the victim when he cross-examined her regarding her prior inconsistent statements.

-14-

The trial court did, in addition, implicitly limit closing argument by telling defense counsel that reading the victim's statements at the interview page-by-page was "not going to help." However, the trial court more than once informed defense counsel that he would be permitted to explore inconsistencies in the victim's testimony or that he could remind the jury of inconsistent statements they had heard during the interview. The defendant proceeded to highlight the inconsistencies in the victim's statement. We conclude that even if the trial court had erred in denying the defendant's request to read the victim's inconsistent responses from the transcript during closing argument, any such error would be rendered harmless by the defendant's use of these inconsistencies during closing argument. *Cf. State v. Lewis*, No. W2010-02517-CCA-R3-CD, 2012 WL 4459809, at *11 (Tenn. Crim. App. Sept. 27, 2012) (concluding that "any error in limiting the Defendant's ability to highlight the victim's tattoo during his closing argument was harmless in light of the evidence against the Defendant and the fact that evidence of the victim's tattoo was proven and before the jury during their deliberations"). This issue is without merit.

### IV. Character Evidence

The defendant next objects to the trial court's alleged limitation on his testimony regarding his relationship with his family members. At trial, defense counsel asked the defendant if he had the opportunity to spend time with adolescents in his family. The State objected to this testimony, citing *State v. Ramirez*, No. M2009-01617-CCA-R3-CD, 2011 WL 2348464, at *15-16 (Tenn. Crim. App. June 8, 2011) for the proposition that a witness could not testify to the defendant's propensity to be a child molester. As the defendant correctly notes on appeal, however, the *Ramirez* court decided this issue based on Tennessee Rule of Evidence 701 and on a witness's inability to render a lay opinion, rationally based on the witness's perceptions, regarding whether the accused is a child molester. At trial, when faced with the State's objection, defense counsel argued that under Tennessee Rule of Evidence 404, he should be able to introduce character evidence. Defense counsel elaborated, "What I'm trying to show is pertinent character trait [–] just being a person who is trustworthy [–] who is family." The trial court ruled that the defendant could introduce this type of character evidence but could not present the jury with a list of children he had not molested. The defendant was then permitted to testify regarding activities he engaged in with his family ("listen to music, play cards, watch TV, watch movies, play games, go to the park") and how many children he had raised ("quite a few that I [have] raised and been around").

A trial court's decision to admit or exclude evidence is reviewed for abuse of discretion. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an

injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010).

Insofar as the defendant alleges that he should have been able to testify regarding whether or not he had molested his nieces and nephews as specific acts under Tennessee Rule of Evidence 404(b) or whether or not he had the pertinent trait of being a child molester under Tennessee Rule of Evidence 404(a), we conclude that the issue is waived. Defense counsel essentially denied that he was eliciting testimony regarding specific acts and represented to the trial court that he did not intend to introduce evidence regarding prior instances of non-molestation or the pertinent trait of not being a pedophile. He told the trial court that he only sought to show that the defendant was a trustworthy person in his family. The trial court ruled that he could do so, as this was proper character evidence under Tennessee Rule of Evidence 404(a)(1). The defendant then testified that he had raised quite a few children in his family and testified regarding activities he engaged in with them. Accordingly, the defendant's testimony was not in fact limited by the trial court, the trial court did not abuse its discretion, and we conclude this issue is without merit.

### V. Sufficiency of the Evidence

The defendant next challenges the sufficiency of the evidence supporting his conviction.[3] On review, an appellate court must determine whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). If the evidence is insufficient to support a finding of guilt beyond a reasonable doubt, the court must set aside the conviction. Tenn. R. App. 13(e). On appeal, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn from the evidence. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). The appellate court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the trier of fact. *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000). Questions about the credibility of witnesses, the weight and value of the evidence, and all factual issues raised by the evidence are resolved by the trier of fact. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). Accordingly, "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption

---

[3]The defendant also alleges error in the trial court's denial of his motion for judgment of acquittal at the close of the State's proof. As the State points out, the defendant's decision to put on proof after the motion was denied constitutes waiver with regard to this issue. *State v. Collier*, 411 S.W.3d 886, 893 (Tenn. 2013). Accordingly, appellate review of the sufficiency of the evidence includes all the evidence introduced at trial. *State v. Gilley*, 297 S.W.3d 739, 763 (Tenn. Crim. App. 2008).

of guilt, and on appeal, the defendant bears the burden of demonstrating that the evidence is insufficient to support the verdict. *Id.*

The defendant was convicted of aggravated sexual battery, which is defined by Tennessee Code Annotated section 39-13-504 as "unlawful sexual contact with a victim by the defendant or the defendant by a victim" when the victim is less than thirteen years old. T.C.A. § 39-13-504(a)(4)(2010). Sexual contact includes the intentional touching of the victim's intimate parts if the touching can be reasonably construed as being for the purpose of sexual arousal or gratification, and intimate parts "includes . . . the primary genital area, groin, inner thigh, buttock or breast of a human being." T.C.A. § 39-13-501(2), (6).

The defendant's challenge to the sufficiency of the evidence is based on Ms. Daley's testimony that she found no physical evidence and on inconsistencies in the victim's forensic interview. However, Ms. Daley's testimony established that she would not expect to find physical evidence given the lapse of time between the victim's exam and the crime, and she testified that lack of physical evidence did not indicate that the victim had not been raped. While the victim gave some inconsistent answers during the recorded forensic interview, she explained at trial that she had lied to the interviewer because she was scared to tell the truth. The victim's credibility was an issue for the jury to determine.

Seen in the light most favorable to the State, the evidence showed that the defendant touched the victim's vagina as she slept in the bed with him and her young cousin. The victim testified he penetrated her. The defendant then told the victim not to tell because he would go to jail. The next day, the defendant took the victim and her cousin to the park, which he had not done before, and gave the victim some money. At the park, the victim told her cousin that their grandfather had done "something nasty" to her. She also called her mother and asked to come home. When she was brought home a few days later, she expressed fear that she would get into trouble but immediately told her parents what happened. The defendant, who found out from his wife that the victim had told her parents, left his home directly, not taking his personal possessions. The defendant did not return the calls of the investigating officer, although he was able to name the officer when the officer appeared at the defendant's mother's home. When he spoke to police, he described a seven-year-old girl as "fast" and agreed this meant "provocative." He then acknowledged that he might have rolled over on her and might have touched her vagina. The victim began wetting the bed and sleeping with the lights on after the assault. We conclude that the evidence is sufficient to support the verdict.

## VI. Sentencing

The defendant also challenges the trial court's sentencing, in particular contending

that the trial court abused its discretion in finding as an enhancement factor that the defendant had abused a position of private trust and in failing to apply the defendant's mitigating factors.

While Tennessee Code Annotated section 40-35-401(d) states that an appellate court reviewing the sentence length, range, or the manner of service shall conduct a de novo review on the record with a presumption of correctness, the Tennessee Supreme Court concluded that this standard of review was in essence abrogated by the 2005 amendments to the Sentencing Act. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). Accordingly, we now review a trial court's decision regarding the length of a sentence for an abuse of discretion, granting a presumption of reasonableness to within-range decisions that reflect a proper application of the purposes and principles of the Sentencing Act. *Id.* In fact, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed" from the Sentencing Act. *Id.* at 706. A sentence within the appropriate range will be upheld so long as "there are other reasons consistent with the purposes and principles of sentencing." *Id.*

We discern no abuse of discretion in the trial court's sentencing decision. The defendant argued at sentencing that the victim did not suffer serious bodily injury, as defined by statute, and that the trial court should consider this as a mitigating factor. *See* T.C.A. § 40-35-113(1). The defendant also sought to have the trial court apply as a mitigating factor under the catch-all provision the fact that he was fifty-six years old, had no criminal history, and had maintained steady employment. *See* T.C.A. § 40-35-113(13) (considering "[a]ny other factor consistent with the purposes of this chapter."). In addition, the defendant challenged the enhancement of the sentence based on a finding that the defendant abused a position of private trust. *See* T.C.A. § 40-35-114(14). The trial court declined to find any mitigating factors, found that the defendant had abused a position of private trust, and sentenced the defendant to twelve years in prison.

We conclude that the defendant's argument must fail because the record reflects that the trial court sentenced the defendant within the correct range and properly applied the purposes and principles of the Sentencing Act. Initially, we note that there was no error in finding that the enhancement factor applied. The Tennessee Supreme Court has stated that the position of parent, step-parent, babysitter, teacher, and coach are "a few obvious examples" of positions of trust. *State v. Kissinger*, 922 S.W.2d 482, 488 (Tenn. 1996). While grandparent and step-grandparent were not included in the Tennessee Supreme Court's limited recital of the most obvious positions of trust, it requires no great discernment to conclude that a grandparent or step-grandparent who has had a child committed to his or her care for a number of days occupies a position of private trust within the meaning of the statute. *Linder v. State*, No. E2008-00693-CCA-R3-PC, 2010 WL 3210399, at *12 (Tenn.

Crim. App. Aug. 13, 2010) (concluding that "[n]o reasonable jury could have concluded that Petitioner was not in a position of trust" when "Petitioner was both the victim's step-grandparent and, at the time, her babysitter"). In any case, and even if the trial court committed error in declining to find any mitigating factors, the misapplication of a mitigating or enhancement factor is not a basis for reversal under *Bise* unless the sentence failed to comply with the principles and purposes of sentencing or fell outside the appropriate range. *Bise*, 380 S.W.3d at 706 (holding that "mere disagreement with the trial court's weighing of the properly assigned enhancement and mitigating factors is no longer a ground for appeal"). As that is not the case here, we conclude that the trial court did not abuse its discretion.

## CONCLUSION

Based on the foregoing, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE

-19-